UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CHRIS M. ZAEPFEL, II ) | Case No. 17-31735-thf |
| ) | |
| ) | Chapter 7 |
| Debtor ) | |
| ) | |
| ) | Adv. No. 17-03048-thf |
| STOCK YARDS BANK & ) | |
| TRUST COMPANY ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| V. ) | |
| ) | |
| CHRIS M. ZAEPFEL, II ) | |
| ) | |
| Defendant ) | |

\* \* \* \* \*

## MEMORANDUM OPINION

This adversary proceeding is before this Court on Plaintiff Stock Yards Bank & Trust Company's ("Plaintiff") Complaint to Determine Dischargeability of Debt, defendant Chris M. Zaepfel, II's ("Defendant") Answer, and the parties' pre- and post-trial briefs.

**I. Jurisdiction**

At issue before this Court is the nondischargeability of a debt under 11 U.S.C. §§ 523(a)(2)(B), 523(a)(4) and 523(a)(6). This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

**II. Findings of Fact**

The Defendant is a dentist. In 1997, he joined an existing dental practice called Woodside Dental, LLC ("Woodside") in New Albany, Indiana, and became a partner with that office's

long-time practitioner, Dr. Woody Oakes. After disagreements arose between Defendant and Dr. Oakes, Dr. Oakes left the practice and Defendant took over the Woodside practice. Defendant received a loan from PNC Financial Services Group ("PNC") to finance the purchase of Woodside. Later, in 2013, Defendant sought additional financing and was offered an 84-month loan at 4.5% interest by PNC. The Plaintiff competed with PNC to earn Defendant's business in this loan. Defendant applied for a loan from Plaintiff, and after reviewing Defendant's application, Plaintiff approved Defendant's application and extended a loan to him on November 23, 2013.

One of the documents included in Defendant's loan application to Plaintiff was a personal financial statement (the "Financial Statement"), which was prepared by Defendant's accountant. The Financial Statement was not accurate. It indicated that Defendant owned a 50% interest in the Defendant's home residence in Prospect, Kentucky, with his wife owning the other 50% interest. It also indicated that he owned a 50% interest in farm property in western Kentucky, with his wife owning the other 50%. Both Defendant and his wife signed the Financial Statement averring that this was true. In fact, Defendant had no ownership interest in the Prospect house because, as he admitted at trial, he had previously deeded his 50% interest to his wife. This transfer was made due to concerns about potential malpractice liability arising from his dentistry practice. In addition, the farm in western Kentucky was not owned by Defendant and his wife. It was owned by a limited liability company ("LLC") called Kirtley Howell Family, LLC, whose members were Defendant's wife and her siblings. Defendant was not a member of Kirtley Howell Family, LLC and he had no ownership interest in the farm.

Plaintiff reviewed Defendant's loan application, the financial condition and operation of Woodside's business, Defendant's tax returns, and the Financial Statement. The business records

showed that Woodside took a financial loss in 2011 and 2012, but ran a profit through the first three quarters of 2013. After the review process, Plaintiff extended a loan of $535,729.51 ("Note 1") and a loan of $50,000.00 ("Note 2") to Woodside on November 13, 2013, with Defendant as a personal guarantor for the loans.

Defendant's practice encountered financial difficulties in the years that followed, and in mid-2016, he began missing monthly loan payments. Plaintiff sent a loan collection officer, Dennis Shaughnessy, to consult with Defendant and attempt a rehabilitation of the practice. These rehabilitation efforts eventually failed, and Plaintiff declared a default on the loans, accelerated their maturity dates, and, on January 27, 2017, filed a state court action against Defendant in Superior Court 3 of Floyd County, Indiana. Plaintiff also filed a motion in that court to have a receiver appointed.

On February 6, 2017, that court entered a judgment granting Plaintiff possession of its collateral, a money award of $429,511.57 plus interest on the Note 1 debt, and a money award of $57,136.33 plus interest on the Note 2 debt. The court also appointed a receiver, Michael Hublar, to assist the bank in taking possession of its collateral and maximizing its recovery.

Defendant filed for chapter 7 bankruptcy relief on May 26, 2017. On August 28, 2017, Plaintiff filed its complaint in this adversary proceeding seeking to except the judgment debt from Defendant's discharge. A trial was held on October 3, 2019.

In his briefings and testimony at trial, Defendant accounts for the inaccurate information in the Financial Statement by explaining that he is a "terrible businessman" with a poor grasp on his personal and professional finances, and that he simply misunderstood his ownership interests in the house and farm at the time of the loan application. For its part, Plaintiff, in its Complaint and other filings, contends that it would not have lent the money to Defendant if not for the false

information in the Financial Statement. It argues that Defendant intentionally or at least recklessly included the false information to obtain a loan. Plaintiff seeks a judgment declaring that the debt owed to it by Defendant is nondischargeable under 11 USC §§ 523(a)(2)(B), 523(a)(4), and 523(a)(6).

**III. Conclusions of Law**

§ 523(a)(2)(B)

Plaintiff argues that Defendant's debt to it is nondischargeable under § 523(a)(2)(B), which excepts from discharge debts obtained by:

> (B) use of a statement in writing —
> (i) that is materially false;
> (ii) respecting the Defendant's or an insider's financial condition;
> (iii) on which the creditor to whom the Defendant is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the Defendant caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). Thus, in order to except a debt from discharge under this section, a creditor must prove four elements. First, the Defendant must have obtained money or credit by use of a written statement that is materially false; second, the misinformation must have respected the Defendant's financial condition; third, the creditor must have relied on the misinformation in extending the loan, and that reliance must have been reasonable; and fourth, the Defendant must have acted with the intent to deceive in obtaining the funds. *In re French*, 563 B.R. 212, 221 (Bankr. W.D. Ky. 2016). A creditor bears the burden of proving each of these elements by a preponderance of the evidence. *In re Keeney*, 227 F.3d 679, 683 (6th Cir. 2000). Exceptions to discharge are construed against creditors and liberally in favor of debtors. *In re Rembert*, 141 F.3d 277, 281 (6th Cir. 1998).

The first element of § 523(a)(2)(B) requires the information at issue to be materially false. Courts have described a materially false statement "as one that paints a substantially

4

inaccurate picture of a Defendant's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." *In re Sharp*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007). It is undisputed that Defendant included information on the Financial Statement that was false, and it is without question that the information was material. The house's and farm's values were substantial, and would naturally influence a lender's decision to extend credit. There is also no question that the financial statement respected the defendant's financial condition, so the first and second elements are both met.

The Court now turns to the third element, reliance. Plaintiff must show "that it actually relied on the false statement (reliance in fact), and that such reliance was reasonable." *In re Oster*, 474 F. App'x 422, 425 (6th Cir. 2012) (*citing Field v. Mans*, 516 U.S. 59, 68 (1995)). The circumstances of this case and the evidence offered at trial suggest that Plaintiff did not rely on the false information in the Financial Statement. The Court takes particular note of the fact that at the time Plaintiff made its loan to Defendant, it was competing with another bank, PNC, for Defendant's business, and that PNC had already offered Defendant a loan package. Plaintiff was certainly aware of this dynamic, as seen in Plaintiff's internal communications while reviewing Defendant's loan application. These communications noted that "We are competing against PNC, which has offered [Defendant] a 84 month note @ 4.5% ... We will be openeing [sic] a full deposit relationship with him, as well as discussing bringing his investments over here to [Stock Yards Bank]." Tr. at 77. The fact that Plaintiff was competing with PNC for Defendant's business is important for two reasons. First, the communications make it clear that Plaintiff knew another bank had already determined Defendant to be a worthy borrower. Second, it makes it clear that Defendant was not "desperate" for Plaintiff's loan business. These circumstances suggest that Plaintiff based its decision to lend on factors other than the financial statement.

5

Additional testimony and circumstantial evidence suggest that the Defendant's alleged 50% interests in the home and farm were not important factors in Plaintiff's decision to lend, and thus Plaintiff did not rely on them. For one thing, even if Defendant had owned the interests in the home and farm as described in the Financial Statement, it would have been very difficult for Plaintiff to recover from those property interests in any event. Although Plaintiff's witness Mr. Shaughnessy did testify that an interest in real property can be seen as a potential target for a future judicial lien, and thus as a positive sign of a guarantor's liquidity, he also acknowledged that a split ownership interest such as the one falsely represented by Defendant would be of limited value to the bank in the event of a default. If that were to happen, the bank would "have to contend with his wife's interest in the property." Tr. at 38. The bank could have acted to reduce this potential difficulty in recovering on the property by asking Defendant's wife to sign as a co-guarantor on the loan, but it did not do so.

In addition to actual reliance, Plaintiff must show that it *reasonably* relied on the false information. "Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances." *In re Ledford*, 970 F.2d 1556, 1560 (6th Cir.1992). In this case, one such circumstance is Plaintiff's own conduct in how it evaluated and treated the false information in the Financial Statement when making its loan decision. At trial, evidence was presented that Plaintiff failed to run title checks on the properties that Defendant claimed he partially owned. Defendant's counsel correctly pointed out that this would have been a quick, easy and cheap (possibly free) process that would have immediately revealed the truth about the property ownership. The Sixth Circuit Court of Appeals has listed the considerations a court should make when evaluating whether a § 523(a)(2)(B) claim has met the "reasonable reliance" element, with one of those considerations being whether "minimal investigation would have

6

revealed the inaccuracy of the Defendant's representations." *Ledford*, 970 F.2d at 1560. In the Court's view, this situation is one of those where minimal investigation – running title checks – would have revealed the inaccuracies. *See also In re Benton*, 367 B.R. 592, 598 (Bankr. S.D. Ohio 2006) (denying a § 523(a)(2)(B) claim and naming "verifying the ownership of the real estate" as a step of minimal investigation the creditor could have taken). In explaining why Plaintiff failed to do so, Mr. Shaughnessy testified that the bank did not run title searches because "if we're not really taking a real estate as collateral, we don't do a title search." Tr. at 46. This further indicates that Plaintiff did not rely on the status of Defendant's alleged ownership interests in determining his creditworthiness.

The circumstances discussed above, considered together, demonstrate that Plaintiff did not reasonably rely on the false information on the Financial Statement in making its loan decision. The Court also notes that Plaintiff failed to present testimony from a loan officer who actually reviewed Defendant's loan application. Although Mr. Shaughnessy was a capable and credible witness, he is not a loan officer at all, but rather a collection officer. He was not a part of the decision to lend money to Defendant, and he did not become involved in the case until after the loan went into default. Plaintiff cannot prove that it reasonably relied on the false information in the Financial Statement when it decided to lend to Defendant without any testimony or evidence from someone who helped make that decision – or, at the very least, someone who has the expertise of a loan officer and can speak to the bank's application review process. Mr. Shaughnessy simply lacks the basis to prove these parts of Plaintiff's claim.

Even taking Mr. Shaughnessy's testimony for the most it can be worth, Plaintiff still failed to prove that it reasonably relied on the false information in lending the money. At trial, Plaintiff's counsel sought an answer about whether "the bank would not have made that loan had

Dr. Zaepfel told the truth about the real estate interests that he had." Mr. Shaughnessy only answered: "Possibly." Tr. at 86. And when questioned by Defendant's counsel about a hypothetical loan applicant who shared all of Defendant's stated financial qualifications, minus the bogus real estate interests, Mr. Shaughnessy indicated that even that potential borrower would have been a strong applicant. Tr. at 61-62. Simply put, Mr. Shaughnessy did not testify, and Plaintiff did not otherwise prove, that the bank reasonably relied on the false information in the Financial Statement. And even if he had testified as such, he lacked the basis to make that determination. The value of his testimony was severely limited because, as he stated himself, "I'm not a loan officer." Tr. at 59. *See In re Moses*, 2010 WL 5420139, at *11 (Bankr. E.D. Tenn. 2010) (denying a § 523(a)(2)(B) claim because the claimant's witness testimony did not sufficiently describe how the financial institution relied on the false information).

Because Plaintiff has failed to prove that it reasonably relied upon the false information in the Financial Statement in deciding to extend the loan, it has failed to meet all the elements to except this debt from discharge under § 523(a)(2)(B). The Court now turns to the second count of Plaintiff's complaint, its request to except debts from discharge under § 523(a)(6).[1]

## § 523(a)(6)

Plaintiff also seeks to except some of Defendant's debt to it from discharge under § 523(a)(6). That section provides:

---

[1] In Plaintiff's Complaint and other filings, it also referenced a claim under § 523(a)(4). However, in its post-trial brief, Plaintiff said of its § 523(a)(4) claim: "discussion of the application of that section of the statute would be redundant to the Bank's case against Zaepfel under 11 U.S.C. 523(a)(6)." As such, the Court will analyze both of Plaintiff's additional claims for partial discharge denial under the framework of § 523(a)(6).

>   (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual Defendant from any debt –
>   (6) for willful and malicious injury by the Defendant to another entity or to the property of another entity

Therefore, a creditor can except a debt from discharge if the creditor can show the debt came from a "willful and malicious injury" by the Defendant. In the Sixth Circuit, "willful injury" and "malicious injury" are separate elements, and both must be met for the discharge exception to apply. *In re Boland*, 596 B.R. 532, 545-46 (B.A.P. 6th Cir. 2019).

A "willful" injury stems from action by which a Defendant intended "the consequences of an act, not simply the act itself." *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, (1998). As such, the Defendant must have acted with the intent to cause injury to the creditor. To make a comparison to a familiar distinction in the law of torts, only debts from *intentional* torts are covered by § 523(a)(6): "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64.

After the Supreme Court issued *Geiger*, the Sixth Circuit decided *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999), holding that a willful injury occurs when the Defendant "desires to cause the consequences of his act, or ... believes that the consequences are substantially certain to result from it." *Id.* As the Sixth Circuit Bankruptcy Appellate Panel explained in *Boland*,

>   this is a subjective standard… It does not matter if a reasonable, objective person would have been aware of the consequences of his or her action; if the Defendant did not subjectively intend those consequences or was not subjectively aware that the consequences were substantially certain to occur then the Defendant's action was not willful. The Defendant, however, need not intend or anticipate the precise nature of the injuries suffered, only that injury would ensue from his acts.

*Boland* at 545 (internal citations omitted). Therefore, in putting on its § 523(a)(6) case, Plaintiff must show that Defendant acted with the intent to injure Plaintiff, not merely that he acted negligently.

9

Plaintiff contends that Defendant committed a "willful and malicious injury" by disposing of collateral and improperly spending the proceeds of that collateral. Plaintiff has identified six categories of property which it alleges Defendant mistreated such that he caused a willful and malicious injury. The Court will analyze Plaintiff's § 523(a)(6) claim with respect to each category, which are:

1. $99,000.00 in accounts receivable, in the form of money owed from patients.
2. $200,000.00 in accounts receivable, in the form of accumulated insurance claims.
3. $25,938.63 in money on deposit in the WesBanco bank account, withdrawn in February of 2017.
4. Unrecovered "high end" goods and furniture with an unknown value.
5. $3,300.00 in "gift" money paid to employees as bonuses.
6. $9,500.00 in debit card withdrawals of cash from the WesBanco account by Zaepfel or with his authorization.

The receiver appointed in the state court action, Michael Hublar, testified as Plaintiff's witness about the patient payments and the insurance claims (categories 1 and 2). After being appointed receiver, Mr. Hublar tried to collect on the unpaid patient bills and insurance claims. He reached out to a sample of the patients with outstanding balances, and every patient who responded to his inquiry "appeared to have legitimate offsets to the balances claimed owed by the defendant." Mr. Hublar determined that the money supposedly owed from patients was not an avenue for meaningful recovery. *Receiver's Report*, Def. Exhibit 5 at 4. Similarly, the receiver had very little success recovering the unpaid insurance claims, getting only $72.00 out of the $200,000 identified by Plaintiff.[2] Mr. Hublar is an experienced receiver who was appointed to the role due to his skill at recovering assets for creditors, yet he was unable to recover anything from patients, due to "legitimate offsets," or from insurance claims. If Mr.

---

[2] Plaintiff's counsel strained to emphasize Mr. Hublar's testimony that he found it unusual that the only insurance claim he was able to recover, for $72.00, was a check made out to "Dr. Zaepfel" personally, rather than to Woodside Dental. But Mr. Hublar also testified that he did not know whether it was common in the medical field to make out checks to a practitioner individual rather than a business entity. The Court is not convinced that this single check is strong enough evidence to conclude or even suggest that a "redirection of [insurance claim] funds" was afoot by Defendant, as Plaintiff seems to suggest in its post-trial brief.

10

Hublar had such difficulty with these claims, it stands to reason that Defendant would have had at least as much trouble recovering on those claims when Woodside was still in operation. More importantly, Plaintiff has not provided any evidence suggesting Defendant did anything untoward with respect to the outstanding patient balances or insurance claims. Plaintiff has not established a basis for a § 523(a)(6) claim on these categories of property.

Category 3, the $25,938.63 in Defendant's WesBanco account that was withdrawn in February 2017, presents the most involved analysis, so the Court will discuss that category last in its discussion of Plaintiff's § 523(a)(6) claim.

Category 4 deals with various high-end items that were bought with Woodside funds and later unrecovered by Mr. Hublar. Defendant testified that these high-end items were purchased in order to "boutique" Woodside's practice and attract higher-paying customers. He testified that while he authorized Jennifer Schmidt, his office manager, to make such purchases generally, he "didn't know what they were" – that is, he didn't know what specific items she was buying. Tr. at 144. He further testified that he would not have authorized Ms. Schmidt to make the specific purchases she did, had he known what they were:

> "Q: If you knew what Jennifer was charging on the Direct Capital account, would you have authorized her to do so?
> A: No, I wouldn't."

Tr. at 176. The Court notes here that it found Defendant's testimony to be generally credible. The impression given by the testimony and evidence is that Defendant's lack of business acumen and failure to oversee his office manager's activity allowed her to make extravagant purchases that were ostensibly for the office.

The purchases were, indeed, extravagant. The items included two Samsung televisions, a glass desk, a buffet, a credenza, and two chandeliers, among many other furniture times. Tr. at

11

144. Many of them were apparently never even used in the office. Tr. at 145. The question before the Court is whether Defendant acted with the requisite intent to cause a "willful and malicious injury" to Plaintiff's collateral when Ms. Schmidt purchased these extravagant items, and when he failed to keep a close accounting of them after they had been purchased. Given the circumstances described above, including the facts that Ms. Schmidt was the one who made the purchases and that Defendant lacked knowledge about the specific purchases she was making, the Court is led to the conclusion that Plaintiff has failed to prove that Defendant had the requisite intent for this behavior to amount to a willful and malicious injury. Defendant's intent behind the purchases was to attract higher-paying patients to the practice, not to injure Plaintiff. Furthermore, when Defendant learned about the extravagant purchases and the missing items, he quickly investigated to learn their whereabouts, discovered they were kept in a storage unit, got the key to the unit, and turned it over to the receiver Mr. Hublar. This conduct is inconsistent with that of a person who intended to injure a lender's position. Plaintiff has failed to establish that Defendant acted with the requisite intent to cause injury in facilitating the purchase of the unrecovered high-end items listed in category 4.

The $3,300 Defendant spent on his staff as "gift money," in the form of staff bonuses and a trip to New York (category 5), is even less problematic to the Court. Defendant testified that a major reason his dental practice ultimately failed was because he had recurring "staffing situations" – difficulty retaining skilled employees. Tr. at 170. It does not strike the Court as out of the ordinary for an employer trying to retain his staff to give them reasonably sized bonuses and a trip to New York. These expenditures do not provide the basis for a claim of willful and malicious injury, and Plaintiff's § 523(a)(6) claim is denied with respect to the gift money.

The Court now turns to categories 3 and 6 of Plaintiff's § 523(a)(6) claim. As mentioned earlier, category 3 is the $25,938.63 in Defendant's WesBanco account that was withdrawn in February 2017, depleting the account to a negative balance. Category 6 lists over $9,500.00 in withdrawals out of Defendant's WesBanco account that occurred before February 2017. Plaintiff suggests that the cash withdrawal of funds from Woodside's operating account is inherently suspect enough for all the listed withdrawals to be the basis of a willful and malicious injury claim. In Plaintiff's view, the fact that Defendant, or Defendant's office manager with his approval, withdrew funds as cash which were then unaccounted for is strong enough circumstantial evidence to determine that those cash withdrawals were done wrongfully, and the full amount of those withdrawals should be held nondischargeable.

By way of background, Defendant testified that he opened the WesBanco account late in Woodside's life because the previous Woodside operating account – a business account with Stock Yards Bank – was getting overdrawn by mezzanine loans that were causing automatic withdrawals to be taken out of the Stock Yards account on a daily basis.[3] Because those mezzanine loans were depleting the Stock Yards business account, Defendant needed a new operating account for Woodside, and he opened the WesBanco account. Defendant also states that, similar to the high-end purchases, he simply authorized Ms. Schmidt to handle the bank accounts and didn't question her actions. By his framing, the cash withdrawals are part of a larger picture of "unorthodox banking practices" and poor business judgment that involved too much delegation and not enough accounting. Defendant also testified that the cash withdrawals were used to pay for various goods and professional services as part of his last-ditch attempt to keep his practice open, but he offered very few specifics and no real evidence of those cash withdrawals being used in this way.

---

[3] Plaintiff (Stock Yards Bank) did not extend these mezzanine loans, and their dischargeability is not at issue here.

13

In short, Plaintiff argues that the cash withdrawals amount to strong circumstantial evidence of a purposeful misuse of the bank's proceeds collateral within the WesBanco account with the intent of damaging Plaintiff's position. Defendant counterargues that his business's operating account was used freely by his office manager with his approval but without his supervision, and was emptied out in Woodside's last few months because cash purchases were used to keep the practice afloat.

The Court agrees with Plaintiff that the sudden and unexplained withdrawal of all the funds from the WesBanco account is sufficient circumstantial evidence to infer a willful and malicious injury by Defendant against Plaintiff. In § 523(a)(6) cases involving conversation of a bank's collateral, courts can use circumstantial evidence to establish the requisite intent: "willful injury may be proven indirectly by showing that the Defendant knew of the Creditor's lien rights and that the Defendant knew the conduct would cause injury to those rights." *In re Sweeney*, 264 B.R. 866, 872 (Bankr. W.D. Ky. 2001). Here, Defendant knew of Creditor's lien rights on Woodside's proceeds, and that he was not allowed to "sell, offer to sell, or otherwise transfer or dispose of the collateral," because those rights and restrictions were spelled out in the security agreement, which he signed. It also strains credulity to suggest that Defendant depleted his entire operating account just before shutting down his practice, but did not know that this "would cause injury" to Plaintiff's rights in the collateral. Plaintiff has met its burden in establishing a willful and malicious injury within the meaning of § 523(a)(6) with respect to cash withdrawals just before Woodside's closing.

This leaves the Court with the challenge of measuring Plaintiff's damages. To do so, the Court must pick a moment in time after which any cash withdrawal can be considered a "willful and malicious injury." It certainly cannot be said that every cash withdrawal ever taken from

14

Woodside's operating account was part of this injury. In its § 523(a)(6) claim, Plaintiff has included all the cash withdrawals from the month of February 2016 (category 3), and all cash / debit card withdrawals dating back to September 21, 2016 (category 6). Plaintiff's reasoning for starting the clock there is that by then, "the business was failing," and Defendant was already missing monthly payments on his loan from Plaintiff. The Court, however, is not willing to impute a willful and malicious motive to Defendant for every cash withdrawal from the WesBanco account starting that early. Defendant's explanation that he delegated banking and purchasing responsibility to Ms. Schmidt is credible, and it seems a bridge too far to simply assume that no cash withdrawals were used toward legitimate attempts at keeping the business afloat, at a time (Fall of 2016) when Defendant was demonstrably engaging in other legitimate attempts to save his practice.[4]

      The Court thinks instead that the most reasonable time to begin the "injury clock" and impute a wrongful motive to cash withdrawals is the moment the Defendant received notice from Plaintiff of its state court action against him on the defaulted loan. This occurred on January 27, 2017, when Plaintiff filed the state court action. At that moment, Defendant knew that Plaintiff was using legal avenues to recover as much of its collateral as it could and, crucially, he knew that Plaintiff was attempting to appoint a Receiver, who would take control of the WesBanco account. From that point forward, any cash withdrawals from the WesBanco can be reasonably attributed to a willful and malicious injury on the part of Defendant. This includes the entire $25,938.63 from category 3, and one $300 withdrawal that occurred on January 30, 2017, from category 6, for a total of $26,238.63.

---

[4] For example, around this time Defendant was taking actions such as employing a business rehabilitation service called Amplify My Practice, attempting to attract new customers by presenting a more upscale environment, actively trying to retain his employees, and focusing on his own work for patients such that he believed Woodside was "starting to move in the right direction… that's where I was, working with the patients." Tr. at 140.

## IV. Conclusion

For the foregoing reasons, the Court holds that $26,238.63 of Defendant's debt to Plaintiff is nondischargeable pursuant to § 523(a)(6), and the rest of Defendant's debt to Plaintiff is discharged. The Court will issue a separate Order consistent with the provisions set forth in this Memorandum.

Thomas H. Fulton
United States Bankruptcy Judge

Dated: February 7, 2020

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **CHRIS M. ZAEPFEL, II** | ) | Case No. 17-31735-thf |
| | ) | |
| | ) | Chapter 7 |
| **Debtor** | ) | |
| | ) | |
| | ) | Adv. No. 17-03048-thf |
| **STOCK YARDS BANK & TRUST COMPANY** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| **CHRIS M. ZAEPFEL, II** | ) | |
| | ) | |
| **Defendant** | ) | |

## JUDGMENT

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** that the prayer of the Plaintiff, Stock Yards Bank & Trust Company, for relief under 11 U.S.C. § 523(a)(2)(B) is denied.

**IT IS FURTHER ORDERED** that judgment in the amount of $26,238.63 is rendered in favor of the Plaintiff and against the Defendant, Chris M. Zaepfel, II, and that such debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). This is a final and appealable Judgment, and there is no just cause for delay.

Thomas H. Fulton
United States Bankruptcy Judge

Dated: February 7, 2020